# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **SONIA M. MUSSAW,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 3:23-cv-00570** |
| | ) | |
| **NASHVILLE SYMPHONY** | ) | |
| **ASSOCIATION,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

This case arises from Plaintiff Sonia Mussaw's claim that her former employer, Defendant Nashville Symphony Association ("NSA"), discriminated and retaliated against her because of her race and disability. Before the Court is NSA's Motion for Summary Judgment (Doc. No. 25), which has been fully briefed and is ripe for review (see Doc. Nos. 26, 29, 33). For the following reasons, NSA's Motion will be granted in part and denied in part.

## I.    BACKGROUND AND UNDISPUTED FACTS[1]

On January 4, 2022, Mussaw, who is African American, began working at NSA (a recording orchestra that employees several hundred employees) as the Director of Human Resources and Inclusion. (Doc. Nos. 1 ¶ 5; 30 ¶¶ 1, 6, 16). Mussaw's position required her to report directly to NSA's Chief Financial Officer ("CFO"). (Doc. No. 30 ¶ 19). NSA did not have a CFO when Mussaw first started, so she initially reported to the company's President and Chief Executive Officer, Alan Valentine, and former Chief Operating Officer, Jonathan Marx, without

---

[1] The facts in this section are undisputed unless noted otherwise and are drawn from the undisputed portions of the parties' statements of facts (Doc. Nos. 30; 34), the exhibits and depositions submitted in connection with the summary judgment briefing, and portions of the Complaint (Doc. No. 1) that are not contradicted by the evidence in the record.

incident. (Id. ¶¶ 20–23). On February 9, 2022, NSA hired Marye Lewis, who is Caucasian, to fill the vacant CFO position, and she assumed supervisory duties over Mussaw and others. (Id. ¶ 25).

Shortly thereafter, Mussaw started having concerns about Lewis' behavior and management style. For example, on February 23, 2022, Mussaw sent a letter to Valentine and Marx complaining that: Lewis "is always attempting to 'help out' with my HR items, which I do not require"; Lewis' "priorities do not appear to be aligned with the best interest of the organization"; and "[u]nless [Lewis] is made to work better, she will stay in the same pattern and it is prohibiting the organization from growth."[2] (See Doc. No. 28-1). Mussaw also testified that Lewis was "hyper-focused" on her and her in-office working hours, and that it did not appear her co-workers were held to the same standards.[3] (Doc. Nos. 30 ¶ 28; 32-15 (Mussaw Dep.) at 10–11).

Mussaw took an approved medical leave of absence from March 3–10, 2022, because, in her words:

> My mental state had deteriorated to such a point that I just could not deal with going in and dealing with [Lewis] again. I just wanted to do my job and it was affecting me to such a point that I went back to my doctor and I explained to him what was going on and I decided to file ADA. . . .

(Doc. Nos. 32-15 (Mussaw Dep.) at 16; 30 ¶ 42). When asked if there was a "particular event that triggered this reaction," Mussaw testified that:

> It was just – it was all of it. It was something every day, just a cacophony of just little things. . . . Watching me, treating me differently than she treated other people. I mean, about the hours. Here I was coming in from 8:00 to 4:30 and I'm – and I

---

[2] Mussaw testified that she sent this complaint because Valentine requested her to "coach [Lewis] up" to be a better supervisor. (See Doc. No. 32-15 (Mussaw Dep.) at 14).

[3] The record reflects that Lewis and Mussaw had several one-on-one meetings, including on February 23, 2022, and March 1, 2022, after which Lewis memorialized their discussions in follow-up emails. (See Doc. Nos. 30 ¶¶ 33, 39; 28-1 at 59–63). The parties dispute whether Mussaw ever directly complained about race discrimination during or after these meetings.

know that the other two finance people are – are kind of not doing the same thing. Whenever I sent out an email or anything, she had to send a follow-up email . . . kind of questioning what I'm doing and kind of undermining me. And the follow-up email wouldn't be to me, it would be to other people.

(Doc. No. 32-15 (Mussaw Dep.) at 16).

On March 8, 2022, Mussaw submitted a physician-signed ADA Request for Accommodation Form to Valentine based on her anxiety and depression. (Doc. Nos. 30 ¶ 44; 28-1 at 65–69). Her physician recommended a one-year accommodation of an "assignment to [a] different supervisor or a mediator between employee and current supervisor if reassignment [is] not feasible," or that she be allowed to work remotely. (Doc. Nos. 30 ¶ 44; 28-1 at 69). Mussaw also identified three potential accommodations, including: "(1) [b]etter supervisory alignment; (2) [a] [m]ediator to continue current supervisory structure, with up to 3 days remote work; [or] (3) [] permanent full remote work." (Doc. Nos. 30 ¶ 44; 28-1 at 66). Valentine responded that NSA would not grant her request to change her reporting structure because it would place an undue hardship on the company, but that she could start working from home one day each week. (Doc. Nos. 28-2 at 64; 30 ¶ 47).

On May 9, 2022, an incident occurred in which Lewis questioned the accuracy of a "voluntary gender/race form" that Mussaw created and sent to "executive staff" to assist the Grants Department with information gathering. (Doc. No. 30 ¶¶ 52, 60; see also Doc. Nos. 28-1 at 70–71; 28-2 at 58). Mussaw viewed this response as an example of Lewis undermining her and "doing just enough to stir the pot for absolutely no reason whatsoever[.]" (Doc. No. 30 ¶ 53). On the morning of May 11, 2022, Mussaw raised the May 9 "voluntary gender/race form" incident to Marx by emailing him a "Workplace Complaint/Harassment Form" ("Workplace Complaint"). (Doc. No. 33 ¶ 60). The Workplace Complaint accused Lewis of:

> Creation of a hostile workplace, harassment, bullying, company policy violations regarding professional conduct and treatment of colleagues. Dishonesty and misrepresentation of presented facts.

(Id. ¶ 60; Doc. No. 28-2 at 58–61). In the Workplace Complaint, Mussaw also described Lewis as "dishonest," "self centered," and "the most dangerous type of bully." (Doc. No. 28-2 at 58–61). Later that day, Mussaw separately emailed Valentine and Marx stating: "I will no longer meet with [Lewis] alone. I am not choosy on the extra body, but there has to be another person." (Doc. No. 32-6).

Marx responded to Mussaw's Workplace Complaint on May 11 at 5:27 p.m., advising her that he forwarded her submission and comments to Valentine, and that "the two of you will be meeting tomorrow morning." (Id. at 60). The next day, May 12, 2022, at 9:36 a.m., Mussaw emailed Marx a document titled, "Addition to formal Workplace Complaint submitted on May 11, 2022" ("Addendum"). (Doc. Nos. 30 ¶ 71; 28-2 at 62; 28-4 at 5). The Addendum stated as follows:

> Given that my predecessor was also a woman of color and had difficulties with the accused. To my knowledge, the accused did not have a problematic relationship with Ashley Skinner, who is Caucasian and preceded both women of color.

(Doc. No. 28-2 at 62). Twenty-four minutes later, at 10:00 a.m., Valentine met with Mussaw for about 20 or 30 minutes and explained she would be terminated. (Doc. No. 30 ¶ 66). Valentine also gave Mussaw the following termination letter at the meeting:

> This is to advise you that the Nashville Symphony Association is terminating your employment as of today, May 12, 2022 for just cause, specifically including insubordination and refusal to perform work reasonably expected. You have repeatedly attacked your supervisor, Marye Lewis, in writing and in an aggressive and rude manner, refused to work with her, and even refused to meet with her. In your latest complaint about Marye, as evidenced both by your email exchanges and written complaint document, you accuse her of something she simply did not do. You have also refused to perform some functions of your written job description, specifically relating to benefits administration, among other things.

4

> As you know, our Employee Policy Manual specifically states that all employment at the Nashville Symphony is on an at-will basis. It is my strong belief that this separation of employment is in the best interests of all involved, including you. . . .

(Doc. Nos. 32-3; 33 ¶ 67–68).

The parties dispute whether Valentine knew about the Addendum or Mussaw's complaints about race discrimination before the 10:00 a.m. meeting on May 12. (See Doc. No. 34 ¶¶ 13–15). Mussaw testified at her deposition that during the meeting, Valentine "mentioned that [her] most recent complaint about *racial discrimination* is just simply not true. And *because of that*, he couldn't see where we could have a working – me and [Lewis] could have a good working relationship, and they were going to go in another direction." (Doc. No. 32-15 (Mussaw Dep.) at 26 (emphases added)). Mussaw confirmed that her "recollection [was] 100 percent clear" that Valentine mentioned racial discrimination when firing her. (Id.; see also Doc. No. 32-14 (Mussaw Decl.) ¶ 19). Valentine, on the other hand, stated that Marx did not forward him Mussaw's Addendum until 10:59 a.m. (see Doc. No. 35-2 at 2), and therefore he did not know Mussaw complained about race discrimination when he made the decision to terminate her, when he wrote the letter of termination, or when he met with Mussaw to inform her of her termination. (Doc. Nos. 32-17 (Valentine Dep.) at 130:24–135:16; 28-4 (Valentine Decl.)). Valentine further testified that the phrase "latest complaint" in the termination letter referred to Mussaw's May 11 Workplace Complaint. (Doc. Nos. 30 ¶ 70; 32-17 at 153:19–154:5).

As a result of her termination, Mussaw brought this lawsuit against NSA alleging racial discrimination and retaliation in violation of (i) Title VII of the Civil Rights Act of 1964 ("Title VII"), (ii) Section 1981 of the Civil Rights Act of 1866 ("§ 1981"), (iii) the Tennessee Human Rights Act ("THRA"), and (iv) the Americans with Disability Act ("ADA"). NSA now moves for summary judgment on each of these claims.

## II.   LEGAL STANDARD

Summary judgment is appropriate only where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a). "The party bringing the summary judgment motion has the initial burden of informing the Court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts."  Rodgers v. Banks, 344 F.3d 587, 595 (6th Cir. 2003).  In deciding a motion for summary judgment, the Court generally reviews all the evidence, facts, and inferences in the light most favorable to the party opposing the motion.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citation omitted).  The Court does not weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter, and instead determines only whether sufficient evidence has been presented to make a material issue of fact a proper jury question.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).  The mere existence of a scintilla of evidence in support of the nonmoving party's position will be insufficient to survive summary judgment; rather, there must be evidence on which the jury could reasonably find for the nonmoving party.  Rodgers, 344 F.3d at 595.

## III.   ANALYSIS

As an initial matter, Mussaw concedes that the Court should grant NSA's motion for summary judgment on her discrimination and THRA claims.  (Doc. No. 29 at 19 n.12).  Thus, the only claims in dispute are Mussaw's claims that NSA (1) retaliated against her for complaining about race discrimination, in violation of Title VII and § 1981; and (2) retaliated against her for requesting reasonable work accommodations, in violation of the ADA.  The Court will address these claims separately below.

A.    Retaliation Under Title VII and § 1981

Title VII and § 1981 make it unlawful for an employer to retaliate against an employee for opposing racial discrimination.  See 42 U.S.C. § 2000(e)-3(a); 42 U.S.C. § 1981; see also CBOCS W., Inc. v. Humphries, 553 U.S. 442, 451 (2008); Johnson v. United Parcel Servs., Inc., 2023 WL 2290275, at *2 (M.D. Tenn. Feb. 28, 2023) ("Complaining about racial discrimination can constitute protected activity.").  The Court analyzes Mussaw's Title VII and § 1981 claims under the same legal framework.  See, e.g., Smith v. Toledo, 13 F.4th 508, 514 (6th Cir. 2021).

To survive summary judgment, Mussaw must support her Title VII and § 1981 retaliation claims "either by introducing direct evidence of retaliation or by proffering circumstantial evidence that would support an inference of retaliation."  Imwalle v. Reliance Med. Prods., Inc., 515 F.3d 531, 543 (6th Cir. 2008) (citation omitted).   "Direct evidence is that evidence which, if believed, requires no inferences to conclude that unlawful retaliation is a motivating factor in the employer's action."  Id. at 543–44 (citations omitted).  "Circumstantial evidence is proof that does not show retaliation 'on its face' but permits a 'reasonable inference' that it occurred."  See Young v. Bernhard MCC, LLC, 602 F. Supp. 3d 1065, 1070 (M.D. Tenn. 2022) (citing Ondricko v. MGM Grand Detroit, LLC, 689 F.3d 642, 649 (6th Cir. 2012)).  Courts only apply the well-known burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 793 (1973) if the plaintiff lacks direct evidence of retaliation and relies on circumstantial evidence to prove her claim.

Here, Mussaw argues that her claims should survive summary judgment because she has presented direct evidence of retaliation.  (Doc. No. 29 at 2–4).  Specifically, Mussaw testified under oath and under penalty of perjury that during the May 12, 2022 termination meeting, Valentine said: "Your most recent complaint about *race discrimination* is just simply not true," and "*because of that*" the company was "going to go in another direction."  (See Doc. No. 32-15 (Mussaw Dep.)

at 26 (emphases added); Doc. No. 29 at 2). Of course, NSA contends it was "factually impossible" for Valentine to make this comment because he did not know about the Addendum or Mussaw's race discrimination complaints until *after* he fired her. (Doc. Nos. 34 ¶¶ 14–15; 26 at 14–15).

Despite the clear factual dispute on this issue, NSA contends that Mussaw cannot rely on her own, purportedly self-serving deposition testimony as evidence to survive summary judgment. (See Doc. Nos. 26 at 15; 33 at 4). The Court disagrees. "Although perhaps not as strong as some other evidence might be, self-serving statements can create a genuine dispute of material fact to be resolved at trial" as long as the testimony is not "blatantly and demonstrably false." Davis v. Gallagher, 951 F.3d 743, 750 (6th Cir. 2020) (citing Scott v. Harris, 550 U.S. 372, 380 (2007)). A reasonable jury could find that if Valentine mentioned Mussaw's "race discrimination" complaint during the May 12 meeting, then it is possible he learned about Mussaw's Addendum before the meeting. To be sure, NSA may ultimately prevail on this issue at trial by showing Valentine had no knowledge of Mussaw's May 12 Addendum before the termination meeting. But accepting Mussaw's testimony as true, and drawing all reasonable inferences in her favor at this stage, the Court cannot conclude that her testimony is so "blatantly and demonstrably false" that "no reasonable jury could believe" her version of events. See Harris, 550 U.S. at 380.

This issue ultimately comes down to Mussaw's word against Valentine's word, and the Court cannot make credibility determinations or weigh competing evidence when ruling on a motion for summary judgment. See Render v. FCA US, LLC, 53 F.4th 905, 914 (6th Cir. 2022) (citation omitted). What matters is that Mussaw's testimony, *if believed*, would be direct evidence of retaliation because it would require the factfinder to conclude that her "recent complaint about race discrimination" motivated Valentine's decision to terminate her employment. See Imwalle, 515 F.3d at 543. Indeed, there is no greater "textbook" direct evidence of unlawful retaliation than

an employer telling an employee she is being fired for reporting race discrimination. See Yazdian v. ConMed Endoscopic Techs., Inc., 793 F.3d 634, 648 (6th Cir. 2015).

Where, as here, "a plaintiff has shown direct evidence of retaliation, the burden shifts to the employer to prove by a preponderance of the evidence that it would have made the same decision absent the impermissible motive." Grizzard v. Nashville Hospitality Cap., LLC, 2021 WL 3269955, at *20 (M.D. Tenn. July 30, 2021) (citation and internal quotation marks omitted). "In the summary judgment—as opposed to trial—context, the defendant-movant must show that *no reasonable jury* could fail to find by a preponderance that the defendant would have made the same decision absent the impermissible (here, retaliatory) motive." Id. NSA does not squarely address this standard because most of its arguments arise in the context of the McDonnell Douglas framework, which as explained above only applies if Mussaw relies on circumstantial evidence. (Doc. No. 26 at 12–16). In any event, NSA argues elsewhere in its brief that it fired Mussaw not because she complained about race discrimination, but because (1) "she was insubordinate"; (2) "she refused to do the work reasonably expected of her and specifically included in her job description"; and (3) "she made an unreasonable demand for a third person to be present in all meetings between herself and Lewis." (Doc. No. 26 at 9). While a reasonable jury could choose to believe NSA's reasons for firing Mussaw, it could also believe Mussaw's testimony and find that this is one of the rare cases where an employee explicitly announced that he was acting "because of" prohibited grounds. See Erwin v. Potter, 79 F. App'x 893, 896–97 (6th Cir. 2003). Accordingly, the Court finds that NSA "has not met its burden to show that a reasonable jury would *have to find*, rather than merely *could* find, that [Mussaw] would have been terminated even absent a discriminatory (i.e., retaliatory) motive." Grizzard, 2021 WL 3269955, at *20.

Because "the Court finds that Plaintiff has shown direct evidence of retaliation sufficient to survive summary judgment on Plaintiff's retaliation claim, . . . it need not consider the indirect-evidence theory and the McDonnell Douglas burden shifting framework." Id. (citing Wiegel v. Baptist Hosp. of East Tenn., 302 F.3d 367, 381–82 (6th Cir. 2002)). Accordingly, the Court will deny NSA's motion for summary judgment on Mussaw's Title VII and § 1981 race retaliation claims based on her proffered direct evidence of retaliation.

B.     Retaliation Under the ADA

The ADA protects employees "from retaliation for engaging in . . . activity covered by the ADA." 42 U.S.C. § 12203(a). "[R]equests for accommodation are protected acts" covered by the ADA. Hurtt v. Int'l Servs., Inc., 627 F. App'x 414, 422 (6th Cir. 2015) (citation omitted). Where, as here, there is no direct evidence of ADA retaliation, the Court analyzes whether there is sufficient circumstantial evidence of retaliation using the same McDonnell-Douglas burden-shifting approach referenced above. See A.C. Shelby Cnty. Bd. of Educ., 711 F.3d 687, 697 (6th Cir. 2013). That is, Mussaw "bears the initial burden to establish a prima facie case of retaliation, which requires a showing that (1) [she] engaged in activity protected under the ADA; (2) [NSA] knew of that activity; (3) [NSA] took an adverse action against [her]; and (4) there was a causal connection between the protected activity and the adverse action." Rorrer v. Snow, 743 F.3d 1025, 1046 (6th Cir. 2014) (citation omitted). If Mussaw makes this showing, then the burden of production shifts to NSA to articulate a legitimate, nondiscriminatory reason for its actions, after which the burden returns to Mussaw to show that NSA's proffered reason was mere pretext for retaliation. See, e.g., Abbott v. Crown Motor Co., Inc., 348 F.3d 537, 542 (6th Cir. 2003).

To establish a prima facie case of ADA retaliation, Mussaw asserts that she engaged in protected ADA activity when she requested the following accommodations for her mental health, anxiety, and depression: (1) the ability to report to a different supervisor other than Lewis; (2)

flexibility to work remotely more frequently; and (3) the ability to never meet with Lewis under any circumstances without the presence of a third party. (See Doc. No. 29 at 6–7). The Court will assume, without deciding, that these requests constituted protected activity (element 1), and that NSA knew about each of them (element 2). And again, there can be no dispute that NSA took an adverse action against Mussaw by terminating her (element 3).

The problem for Mussaw is that she has not presented any evidence demonstrating a causal connection between her alleged ADA protected activity and her termination. Mussaw asked if she could report to a different supervisor and work remotely in March 2022, approximately two months before her termination. But although NSA rejected her request to change her reporting structure, and only partially granted her request to work remotely, there is no evidence that Mussaw suffered any adverse employment consequences for making these requests. See Salgado v. BlueCross Blue Shield of Tenn., Inc., 2021 WL 6496749, at *13 (E.D. Tenn. Aug. 9, 2021). Absent *any* evidence of retaliatory motive, Mussaw's claim that she was somehow retaliated against for making these accommodation requests is entirely unsupported and speculative.

The analysis is slightly different for Mussaw's alleged request to "no longer meet with [Lewis] alone" because she sought this "accommodation" from Lewis in a May 10, 2022 email, i.e., only two days before her termination. (See Doc. No. 32-6). The Sixth Circuit has held that when "an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity . . . is significant enough to constitute evidence of a causal connection[.]" George v. Youngstown State Univ., 966 F.3d 446, 460 (6th Cir. 2020). Of course, "temporal proximity alone is generally insufficient to establish a causal connection, and instead, 'must be coupled with other indicia of retaliatory conduct.'" Salgado, 2021 WL 6496749, at *13 (quoting Eyster v. Metro. Nashville Airport Auth., 479 F. Supp. 3d 706, 719 (M.D. Tenn.

2020)).  Despite the potential temporal proximity between these events, Mussaw admits that her May 10 request "had no bearing on the termination decision" and played no role in "the motivation of Valentine to fire" her.  (Doc. No. 30 ¶ 57).  Mussaw's opposition brief doubles down on this admission, stating that "[n]o record document supports that Valentine decided to terminate [her] 'upon receipt of that email.'"  (Doc. No. 29 at 7).  These critical admissions foreclose any possibility that Valentine unlawfully retaliated against Mussaw merely for making her accommodation request.

It is worth emphasizing the subtle difference between retaliating against an employee for engaging in ADA protected activity, and terminating an employee for refusing to get along with a supervisor.  The sole purpose of the ADA is to make sure "that disabled persons have the same opportunities available to them as are available to nondisabled persons," not "to interfere with personnel decisions within an organizational hierarchy."  Gaul v. Lucent Techs., Inc., 134 F.3d 576, 581 (3d Cir. 1998).  Thus, other courts have held that "an employer is not required to provide an aggravation-free or stress-free environment, or to reassign an employee away from any supervisor or coworker who may cause stress or conflict."  Patterson v. McDonald, 220 F. Supp. 3d 634 (M.D.N.C. 2016) (citation omitted) (collecting cases).  This is not to say that Mussaw's poor working relationship with Lewis was the true reason for her termination, as it will be up to the jury to decide that dispositive issue.  See supra Section III.A.  But it does mean that NSA could terminate Mussaw for her behavior without necessarily violating the ADA in this case.

In sum, the Court finds that Mussaw failed to create a genuine issue of material fact to support her prima facie case of ADA retaliation because there is no evidence that Valentine retaliated against her for requesting mental health accommodations.  Accordingly, NSA's motion

for summary judgment will be granted as to this claim, and the Court need not address the remaining steps in the McDonnel-Douglas framework.

IV.     **CONCLUSION**

For the foregoing reasons, NSA's Motion for Summary Judgment (Doc. No. 25) will be granted in part and denied in part.  The Court will dismiss Mussaw's THRA and ADA claims, as well as her discrimination claims under Title VII and § 1981.  Mussaw's remaining retaliation claims under Title VII and § 1981 will proceed to trial.

An appropriate order will enter.

_____
WAVERLY D. CRENSHAW, JR.
UNITED STATES DISTRICT JUDGE